Case No. 24-1442, Thomas Reichert et al. v. Kellogg Company et al. Argument is not to exceed 15 minutes per side. Ms. Pathak for the appellants. Thank you. Yes, please come up. These first two cases share common issues, and the second case has some additional issues. The panel wanted to do it back-to-back, but to also give you each your own time, so that the primary issue will be addressed first, but that does not mean that the what case cannot also address that issue. We just want to avoid repeating the same arguments over and over, so if you will be cognizant of what the other case is arguing and add your additions, but you will have your time because these are important issues. So you may begin. Appreciate that. Good morning, Your Honor. May it please the Court. Rachna Pathak for the plaintiffs. I'd like to reserve four minutes for rebuttal. Since it was enacted, ERISA has required pension plans to offer married participants joint and survivor annuities. 29 U.S.C. 1055-D requires those joint annuities to be the actuarial equivalent of a single annuity for the life of the participant. Defendants here are calculating plaintiffs' joint annuities using mortality assumptions from the 1970s. That fails to provide a joint annuity to each participant that is the actuarial equivalent of a single annuity for the life of the participant. Do you know how long this employer has been offering these plans? Has it been since the enactment of ERISA in 1974? Yes, I believe so, Your Honor. ERISA's requirement to provide joint and survivor annuities has existed since its enactment, and so I believe this plan has been offering joint and survivor annuities since the plan was first put into place. And you would agree that in 1974 there would have been a meaningful actuarial equivalence? Yes, Your Honor. Absolutely, I think that there is... Is the meaning the same today as it was in 1974? Yes, I believe so, Your Honor. What evidence do you have of that? I don't think that I can point to any specific evidence that the meaning is exactly the same, but I don't think that there's any suggestion that it has changed over time. What would be the meaning in 1974 of actuarial equivalence as of that date? It would mean that two annuities have an equal total value using the same set of assumptions, and what's relevant here, Your Honor, is that the defendants, by using a mortality assumption from the 1970s, is not providing each plaintiff with a joint annuity that has the same... What's the difference? The difference you're saying is mortality tables that are being used today versus what they were used in the 70s? Is that the only difference you're saying that's going on today? Your Honor, are you asking about what's the difference in how the plan is offering joint and survivor annuities, or what the difference might be with respect to the definition of the term? I guess I'm trying to understand ordinary meaning of the words actuarial equivalence as of 1974. So I think, Your Honor, that in 1974, when ERISA was enacted, the plain meaning of this provision, which is that the joint annuity has to be the actuarial equivalent of a single annuity for the life of the participant, had the same meaning that it has now, which is that the joint annuity has to have the same total value as the real-life, single-life annuity. Okay, and is that coming from industry, literature? Where are you getting that? So courts have interpreted the meaning of the term actuarial equivalence. I'm asking, in 1974, there was not any court interpretation of the word actuarial equivalence. Is that correct? I'm not aware of authority as of 1974 that interpreted it. So what sources from 1974 would you look to to determine the meaning of actuarial equivalence? Your Honor, I'm not sure that we need to look at sources as of 1974 to understand. Why not? Isn't that when the statute was enacted? Well, it certainly was, Your Honor. So I think that we could look at dictionary definitions as of 1974. We don't cite any and either do the defendants. Okay. Was this an industry term of art as of 1974? I believe that it was an industry term of art even as of 1974. I don't have an authority for that. We don't. Actuaries from 1974. I'm not aware that we cite any books from 1974. Your Honor, I... Do you know when the term actuarial equivalence was first used in the industry? I don't have any authority for when exactly it was used. With all due respect, Your Honor, I do want to make sure that we're... How can we determine original meaning if we don't have any sources from 1974 or before saying what the meaning of the words actuarial equivalence mean? So, Your Honor, I think it's important to look at the entire provision, which is that the joint annuity has to be the actuarial equivalent of a single annuity for the life of the participant. And I think that as of 1974, if we had a dictionary definition as of then for any of those words, it would not be any different than it is today. Would it help us if we actually had you brief that issue? I'd be always happy to brief any issue that the court would like me to brief, but I... It's very hard for me to understand original meaning if we don't have any sources. So, Your Honor, with all due respect, I don't think anybody is taking the position that the meaning of the term has changed over time. And I don't think defendants are... I know, but the point is you don't have any definitions of what the meaning has ever been, apparently. I mean, do you have any sources, original sources from the industry saying what actuarial equivalence means? I don't believe... Let me add something to that question. Isn't the distinction here that actuarial equivalent is an accounting term that has been used historically in many different contexts? But what is at issue here is how it is used in ERISA. I don't think... My understanding is actuarial equivalent is not an ERISA creation. It is an ERISA explanation. Using accounting terms in the actuarial world, which has been around for a long time because people have calculated how to... What fee you use for a life policy, for example. Does that help or does that change anything? I think that's exactly right, Your Honor. I don't think that ERISA was writing on an entirely blank slate. The concept of annuities having value is a longstanding concept. And we know what that means. What sources have you given us to tell us what that meaning is? So, Your Honor, we've cited the Richards case, the Stevens case. Sorry, the Stevens case, which is not... That co-states 1974. So, Your Honor, I am not aware of any sources as of 1974. A question then about that case, and I'm curious. It goes, I guess, to Judge Bush's question. So I understand the actuarial equivalence to be, okay, the present value has to be the same. And what the D.C. Circuit said is, it's a term of art. It means that we're going to have, essentially, equal present value under actuarial assumptions. But there's nothing in there about what those assumptions are or that there has to be any characterization of the assumptions. So Judge Stranch's question also is, like, this term has been around. It's been kind of knocking around accounting, tax, whatever it is, or insurance. But where is the evidence that the given assumptions that go into the equivalence calculation have to have some additional... There's some additional requirement. There's a reasonableness requirement. Or, yeah, every actuary would know you don't use an outdated table. That's where I'm struggling to find that. And as you know, there are other statutes and other parts of this statute that seem to have those requirements. And so usually we would say, Congress says something somewhere and not another. Then we give that credence. I want to be very clear about our position, Your Honor, because I think that there has been some confusion. Our position is that the two annuities have to have an equal value. The statute demands a comparison between the joint annuity and something. That something is a single-life annuity for the life of the participant, meaning the real-world single-life annuity. That comparator is where the confusion is coming from. This statute mandates a particular result, which is that the joint annuity has to be equal to the value of the single-life annuity, not as of 1976, but as of 2000 or 2019 or 2020, when the participants were retiring. So that's where that result is what mandates the assumptions being reasonable. If there is equivalence and it is for a life, I mean, it's a single life. It's just that I'm using a mortality table from 1971 to calculate it. Your Honor, I don't think you would allow the defendants to calculate the value of the single-life annuity by using the wrong monthly payment. It's no less accurate to use an outdated mortality table. You are not giving the participant the value of their single-life annuity, the real-world value of their single-life annuity, when you use an outdated mortality assumption. So single-life annuity is doing all the work here? It's not doing all the work, Your Honor. It seems like it's doing a lot. It's doing a lot of work. Absolutely it is. And the defendants want it... It's really about actuarial equivalence. It's about what single-life annuity means, and it means this particular person's single life. And by the way, that would mean an individual calculation for everybody, right? Nope. Could I pick one year and I'm going to apply this table, or do I have to change it day by day, hour by hour, whatever it is? Your Honor, the concept of present value is a familiar concept, and there isn't only one number, and actuaries don't approach it in only one way, so there is some range and some discretion. What evidence is in the record about what actuaries do to determine reasonable value of equivalency? Well, of course we're at the motion to dismiss, Your Honor, and we plausibly allege, and the defendants haven't disputed, that they are providing joint annuities that are worth less than the single-life annuity as of the date of retirement. So they haven't disputed that our plaintiffs are receiving a joint annuity that has a total value that is lower than the total value of the single-life annuity when you use current assumptions. Their position is that they're allowed to measure the comparator, which is in the statute. Using an outdated mortality assumption... Current assumptions. What are the current assumptions? What are you saying current assumptions are? What did you plead they were? We pled that they were the... We referred to the assumptions in 417E as an example, but the point is that a 40-year-old mortality table bears no resemblance to reality, Your Honor. You can't measure the value of a single-life annuity that is commencing in 2020 by estimating the total lifespan of payments using a 1976 mortality table. You undervalue the single-life annuity. The statute demands the comparator. It says the life of the participant, not a participant or any life. We're talking about the real-world plaintiffs here. And I think, Your Honors, you would not allow, and no one would allow, these defendants to calculate the comparator by looking at someone other than the plaintiffs. But that's what you're letting them do when you let them use an outdated mortality assumption. That phrase, Your Honor, is not doing all the work. It's doing a lot of the work. It is the phrase that the defendants want to ignore, and it is the phrase that distinguishes this statute from other statutes. It's important to look at this provision. It's plain text demands the outcome that we're asking for. But as you've recognized, it's important to look at the context as well. In 1974, Congress wanted to make sure married couples got an annuity that was worth the same as what they would get if they retired when they were single. You are allowing, if you would accept their position, you are allowing defendants to provide an annuity that is worth less than what that exact same person would get if they were single. That doesn't make any sense. This is a statute that promises equivalence, and the purpose is to protect married participants. If you let the joint annuity be worth a smaller amount, then what are married participants going to do? They're either going to get paid less, or they'll opt out of the joint annuity altogether, and that leaves the surviving spouse with no income. That's the opposite of what Congress intended. So I think it's important here that we look at the comparator in an accurate way, and without looking at that comparator, you can't assess whether there's actuarial equivalence. These two annuities, so the entire problem is the math trick that the defendants are engaging in. They want to be able to measure their joint annuity against anything, not what the statute requires them to measure the joint annuity against. I think your time is up. You will have your rebuttal. Thank you. May it please the Court, my name is Joseph Torres. I represent the defendants. To start where counsel left off at the end of her remarks, what the defendants are asking here is to be allowed to do what ERISA requires, that is, use the terms of the plan to make this calculation. That is a fundamental bedrock principle of ERISA. Courts have repeatedly acknowledged that the written instruments should govern, subject to what specific requirements the statute may put out as sponsor. We're not denying that. And it also allows us to honor the Supreme Court's repeated admonitions that this is a comprehensive statute that was subject to much debate, and courts should not be tampering with this scheme unnecessarily. We also believe that the established statutory construction principles of this circuit recognize exactly that. So you're relying on the Russello case concept that you presume that Congress acted intentionally and purposefully. Yes, Your Honor. In making this distinction. I'm struggling a little bit with that here because our case law and Supreme Court case law makes clear that Russello applies when a statute uses the same or similar language and formulation for its statutory provisions. Isn't that correct? Yes, Your Honor. And we know from Russello and City of Columbus, another Supreme Court case, that that presumption grows weaker with each difference in the formulation of the provisions under inspection. Correct? Yes, Your Honor. And so what we have here is it seems to me that we've got perhaps a difference in language and formulations in 1099 than might be existing in your, in the Russello concept here. None of the other sections that you cite the term actuarially equivalent, none of those sections that you rely on for the Russello idea use the words actuarial equivalent. Isn't that correct? That's correct, Your Honor. And nor do they require that one form of benefit be the actuarial equivalent of other forms of benefit. Correct? With one exception, Your Honor, and that's within 1055 itself. The lump sum annuity calculation, which is within the same statutory provision as 1055D, which they cite, I'm sorry, rely upon, Your Honor, requires specific mortality tables. It requires specific interest rates to be used. And so to the extent other statutory provisions within ERISA use slightly different terminology, I appreciate your point, Your Honor, but you don't have to go any farther than 1055 itself to see that Congress knew exactly how to specify particular factors to be used when making certain calculations. Now we would say, given the nature of ERISA, that perhaps it exists in a somewhat different plane because, again, this was a comprehensive statute. Congress was looking at a lot of things, bringing them all together. And so the fact that you may have a slightly different terminology for withdrawal liability purposes or plan funding purposes may perhaps, when you've got a disparate collection of statutory provisions, weaken that argument. I don't believe... I struggle to see even the comparator. In one, ERISA is doing exactly what ERISA requires to do. In this one, because it arises in the payment of the accrued benefit and in what format it takes. Withdrawal liability is a different animal. It's about what employers pay when they want to withdraw from a plan. And it's there for the purpose of keeping the plan from having serious financial consequences because one of the main funding devices, one of the employers, leaves. But here, what we're talking about is actuarial equivalence in the receipt of the entities, the receipt of the persons that ERISA carries. I'm struggling with the argument because the formulation of ERISA to me explains exactly why this difference is key. ERISA has always and long been acknowledged to have grown from the common law of trust. It is simply about fiduciary duties. And it's about fiduciary duties. I like very much when the statute was passed, there was a great deal of scholarly discussion about what it meant. And one of the keys to that was that a fiduciary of an ERISA plan is a holder of what it was termed other people's money. So right now, and I'm sure you're familiar with that concept too, so right now what we're looking at is how does a plan define what those trustees do with the other people's money, their accrued benefit that they are owed. And this statute, why is the statement in this statute, in your estimation, that the single life annuity, the comparator, unmarried versus married, obviously a protection of both parties, both the recipient and the recipient's spouse. Why is the statement and requirement of actuarial equivalence not a clear statement that it means what it says? It means they've got to be equal. The single man gets a single life annuity, the married man gets a qualified joint and survivor annuity with some choices in what percentage remains. But the goal is to treat them equally because the fiduciaries are required to do that. Your Honor, I have two responses. The first one is that the owed money that we're talking about here is the product of a decision by a private employer to sponsor a pension plan. And so one of the other things that underlies ERISA, which has been repeatedly acknowledged, is that Congress intended to give private employers the flexibility to establish benefits or not. Yes, but, counsel, the deal is they don't have to do it. But if they do it, they have to do it right. Correct, Your Honor. Isn't that the argument? Well, that's part of the argument, Your Honor. The other part of this is that, to the earlier colloquy with counsel, there are lots of mortality tables. There are lots of interest rates. And so Congress certainly showed within ERISA, whether you consider the purposes of various provisions to be analogous or not, that it knew how to specify standards to apply to different things. It could encumber certain aspects of a plan sponsor's actions. And it chose, for whatever reason, not to do that here. All it required is that the plan sponsor, having chosen to establish a benefit, put in writing what those provisions are. There's no dispute here that... So it's your agreement, it's your concept, that under ERISA, under ERISA's fiduciary responsibilities, you may use mortality tables for many times. I mean, I know the 1600 was one of the analogies, but the court clearly said you can use whatever you want. Because if you retract from actuarial equivalence, the concept of reasonableness, then there is no governing principle by which the employer is bound. Right? I would disagree, Your Honor. I would say... So what is the governing principle, if you're telling me that they don't have to be reasonable? The governing principle is their obligation to adhere to the terms of the plan that they elected to structure. Participants are free to vote with their feet, Your Honor. If they view that this benefit is not sufficiently calculated to a level that's acceptable to them, they can choose. So plan sponsors have to make decisions. How much of a benefit should I provide? And once they've established that benefit and put it in the document, it's a fairly well-established, I think courts generally agree, that the fidelity to that written instrument is what drives the obligations of the plan to continue to adhere to the private benefit plan that it chose to establish. I wonder, is it possible that you would be in... Would you be violating the Treasury reg, the IRC reg, the 401 reg? I don't... They analogize to the 401 reg, and I understand that your position is that 401 reg doesn't inform what actuarial equivalence means in this case. Okay, I got that. What about as a matter of favorable tax treatment under 401? Yeah, I... Would the reg do... Would the reg say, if you do this unreasonably, and you're in... I guess it would be what the IRS would say, you're in violation of this reg? I believe that's the consequence of failing to adhere to those, Your Honor, but that's not obviously what we're... You know, I think the purpose is... For compliance purposes, employers maybe use a variety of mortality tables and interest rates. Well, I'm curious, like if you use the mortality table from the 1600s, would you be putting at risk your favorable... the tax treatment of your plan under 401? I mean, I'm not an actuary, Your Honor, but I certainly understand the point that there may be a point along some spectrum of activity that may give rise to these, but that's not what we have here. Well, let me ask you this, back to my original meaning point. If you look at 1974, would you not agree that it would have probably been outside industry norms in 1974 to use mortality tables from the 1600s? Yes, I would agree with that. Would you... So I'm grappling with how we define the term's actuarial equivalent, and what I'm driving at is shouldn't we be looking at the world in 1974 on how the industry was applying the term? And if the industry was not using 1600 mortality tables as in 1974, that seems like pretty strong evidence that actuarial equivalence does not include that usage. I think that's a fair observation, Your Honor, and I think that, again, there is some level of flexibility that plan sponsors are entitled to apply to this if they so choose over the life of a plan. So if you're talking about a plan established in 1974 following the passage of ERISA, I wouldn't be shocked to find that most plans were using calculations of data that existed at that point in time. But there's no... But I guess the question is whether there's some kind of substantive limitation, and I hear you saying, no, there isn't. There has to be equivalence, meaning something has to be equal, but there isn't some unsaid assumption about what that has to be, and the consequence of that is, yes, maybe it is. Maybe there's some vastly outdated mortality table that gets used. But, Your Honor, it seems to me that whether there is a flaw to your point about this particular statutory provision, and I don't concede that, then, as the lower court suggested, the solution there is not to import terminology from different regulations or different... No, I understand that. Do you think that actuarial equivalence is a term of art or a trade usage, something like a UCC we would look at extrinsic evidence for? I don't believe you can look at today's how that phrase is used to determine what Congress intended when it passed the statute in 1974, Your Honor. I do think that, to the earlier colloquy, these concepts are not new, but I also think ultimately that what an actuary may decide to do in a particular circumstance certainly cannot determine how a statute should be interpreted. You should be interpreted by using the plain language, and if there is an alleged gap there, then the solution is to go to Congress and say, there's a problem here that needs to be addressed. The solution is not to say, well, let's import this Treasury regulation or let's import these tables that exist in another particular provision of oversight. I don't believe there's a problem, Your Honor, because, again, ultimately, I believe this is a function of what Congress allowed employers to do, and there may be some extreme example out there that we're not faced with right now, but that doesn't allow, give courts license, with all due respect, to start importing terminology from other parts of a statute. How many of these plans are subject to negotiation, like union negotiation? I didn't catch the first part. How many of these plans, how many of these provisions are the subject of negotiation? I would assume quite a number, Your Honor, certainly. You don't have any idea, like, the percent, like 80% of them, 20% of them? I mean, what I can tell you is that this Kellogg plan we're dealing with here was historically largely a collectively bargained plan. Over time, that changed so that it's now principally non-collectively bargained. So it's not bargained, okay. So all the plans at issue here were non-bargained? As it currently sits, Your Honor, it is. What I say is that there's a lot of legacy collective bargaining relationships that were probably the origin of this plan at some point when Kellogg was largely a manufacturing operation with lots of represented employees. That's changed over time. Has the mortality table changed at all under the plans at Kellogg? I don't know the answer to that, Your Honor. I have what the plan... The current plan, I don't have... I realize it's a motion to dismiss. We're kind of going beyond, or I am going beyond. I'm just kind of curious. I'm not sure of the answer to that, Your Honor. What I would tell you, Your Honor, is if you look at the... I'm almost done, but if you look at some of the exhibits to the principal plan, you will see that there are a variety of other more actuarial equivalent calculations that are set forth for different bargaining locations. But obviously in the main, what we're dealing with is the principal benefit provision in the present plan as opposed to some of the historical legacy plans. Thank you. Thank you, Your Honor. We ask that the lower court's decision be affirmed. Thank you. Thank you.  So I just want to be clear that the defendant's position is that they are allowed to insert any actuarial assumptions... They are allowed to use any actuarial assumptions that they would like as long as they're written down in the plan to calculate the joint annuity. There is no legal limit that they can identify. 1055D would be the provision that would limit the actuarial assumptions that they can write down. And so what they're asking you to endorse is an interpretation of the statute that allows... Going back to my question about the treasury reg, do you think they're in violation of the treasury reg? Your Honor, I'm not familiar with how specific enforcement activity works, but I... Do you think what they're doing is inconsistent with the treasury reg? I think that what they're doing is inconsistent with the regulation that requires the use of reasonable actuarial assumptions. That reg. 411 or 401, Your Honor. 411, I think. Yeah, so the... I do think it's the IRS's... The IRS would be the one that would enforce that. Like, they would be the ones that would go in and say, hey, you're in violation of this reg. We're going to... Your tax treatment under 401 is at risk. Your Honor, again, I'm not familiar with how specific enforcement works, but I think that the point is that if you believe that, Your Honor, then you'd want the two parallel provisions of the IRC and 1055... And ERISA, 1055D, to be interpreted the same. You wouldn't want those two statutes, which have identical language, to mean different things. And so I think that points to why you should interpret 1055 in a manner that's consistent with its plain text, which is that there's a comparator that has an actual value. Now, the... Let me ask you, is your position that you have to have reasonable assumptions in determining actuarial equivalence? My position, Your Honor, is that the two annuities have to have... That the joint annuity has to have the same value. And that would be if it's... You have to have a reasonable understanding of what the mortality table is and what the discount rate is. You have to have an accurate assessment of the value of the single life... How do you determine accuracy under your standards? So I do think that that gets us to reasonableness. I'm not trying to fight the term reasonableness. I'm not really... My question is, how do you determine accuracy or reasonableness? For a mortality table, and how do you determine it for a discount rate? And how often do you have to do it under your standard? So the standard is that... I think you can use a professional standard of care, an actuarial standard. How would an actuary value the single life annuity of someone who's retiring in 2020? And there's a range there, but that concept of value, present value, it's a widely understood concept. It's not confusing. And so the point is... Listen, could a plan use unreasonable factors that are pulling in opposite directions and get lucky? A broken clock is right twice a day. But they have to get the right result. And the way that actuaries get the right result is by using reasonable assumptions. How often do you do that under your standard? Every year? Is that what you're asking for? Your Honor, plans have some discretion in how they choose to make these annuities have the same value. They can update regularly. That can change from day to day. You have to have some standard. What would be the standard if we were to find this reasonable requirement? How often would they have to go and update? There's not a bright-line answer to that question, Your Honor. Plans can use an automatically updating standard, but this Court is very comfortable applying standards that are fact-sensitive. And not all cases... Can I just create... The Chamber has made this point that it creates this litigation incentive because you can always argue that something's unreasonable because you weren't using the most accurate... So it invites us... My concern with it is that you're opening a Pandora's box of sorts, that you have to start articulating all these standards for what is reasonable and what's not. It's not a simple accuracy thing, it seems to me. It seems like you have to take into account a lot of different variables, and one of them is how often you do it. Anyway, I'm just throwing out my concerns to you. Your Honor, I understand, but... He touches an important concept, but it's a concept that runs throughout ERISA and always has. Fiduciary duties require that plans be kept up to date and that recipients of benefits be treated fairly and reasonably. That's the meat and potatoes of fiduciary claims under ERISA. As you say, that is... I don't... You're not saying that there is a time frame that they have to be reviewed because fiduciary duties require you to be always reviewing the nature of the plan and assuring the propriety of what you're doing with other people's money. That's exactly right, Your Honor. This is not an unfamiliar standard to ERISA, and in fact, the statutes that we think... They point to statutes that have the term reasonable in them. Courts apply the reasonableness standard all the time, and you do it in the context of ERISA. Those statutes actually have the word reasonable in them. This one does not. But, Your Honor, this one requires that you achieve a certain result, and it's a standard that... I go back to the question of what's actuarial equivalence. That's the only words we have to go on here. Actuarial equivalent of a single annuity for the life of the participant, that means that they have to have the same present value as an actuary would determine the present value in the real world. For a participant... You're adding words. No, Your Honor. That's the life of the participant. That's the real-world participant. I'm not adding words. What are the assumptions in the real world? It falls back into the whole problem of determining what are the assumptions, how often you have to make this calculation in the real world. It seems to be very difficult to manage this standard. Your Honor, that's a concern that applies anytime Congress writes a standard instead of a very specific rule. So, you're right that Congress didn't... If they had given the green light with the word reasonable, yes, we would be in that standard world, but we don't have that word in the statute. So, Your Honor, I don't think we're trying to add a word. The defendants are trying to remove words. If you let them measure... I'm trying to measure reasonable. Can it be implied in the words actuarial equivalence? Can it be implied? And that's why I'm interested in the original meaning of those words. But if you don't have the word actual of reasonable in the statute, you're going to have to say it's implied in those other two words. I don't think so, Your Honor. And that would be evidence of what the meaning of those other two words are. I'm sorry to interrupt. I don't think that it's not an implied... We don't have to say that it's implied. They have to explain why they are allowed to provide a joint annuity that is equivalent to a number that is different than the value of the single life annuity. They can't do that. And Congress requires a result to be achieved all the time. Statutes are written that way all the time. Plans have some discretion in how to get the right result, but they're not getting the right result here, and they're not arguing that they're getting the right result here. They're not disputing the plausibility of our allegation that the value of the joint annuity is lower than the value of the single annuity calculated today. They're saying it doesn't matter. The joint annuity can be worth anything, and that's not consistent with the language of the statute. Of equivalency. I think your time is up. Thank you, Your Honor. Further questions? We thank you both for your very good arguments and briefing in a complicated issue. The case will be taken under advisement and an opinion issued in due course.